UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

STEPHEN LEE GOCHROS,
    Plaintiff,
v.

ALARMAX DISTRIBUTORS, INC.,
    Defendant.

No. 3:15-CV-1552 (MPS)

**RULING ON MOTION FOR SUMMARY JUDGMENT**

Plaintiff Stephen Lee Gochros filed this action against Defendant AlarMax Distributors Inc. ("AlarMax" or "Defendant"), alleging that AlarMax failed to pay him agreed upon commissions for his work performed as a branch manager at its Milford, Connecticut distribution center. Gochros filed a one-count complaint alleging that AlarMax's failure to pay him over $130,000 in earned commissions violated the Connecticut Minimum Wage Act ("CMWA"), Connecticut General Statutes ("Conn. Gen. Stat.") § 31-58 *et seq*. Gochros sought his unpaid commissions and penalty damages available under the CMWA, among other relief. On June 30, 2017, AlarMax filed a motion for summary judgment, asserting that Gochros was not entitled to the commissions he seeks under the plain language of his employment agreement. (ECF No. 40.)

For the reasons set forth below, AlarMax's motion for summary judgment is DENIED, as the employment agreement is ambiguous as to key aspects of Gochros's compensation, and there is conflicting extrinsic evidence in the record about the parties' intent. Therefore, genuine issues of material fact exist as to whether AlarMax improperly withheld Gochros's earned commissions.

**I.    Factual Background**

The following facts, which are taken from the parties' Local Rule 56(a) Statements and the exhibits, are undisputed unless otherwise indicated.

    **A.  Gochros Seeks Employment with AlarMax**

1

AlarMax is a wholesale distributor of electronic security, alarm, and video equipment. (ECF No. 40-1 at 3.) Gochros, who has worked in the security sales business since 1980, was employed as a branch manager at AlarMax's former Milford, Connecticut office. (ECF No. 40-4 at 3, 7-8.)

In May 2010, while he was working as a branch manager at another security sales company, Alarm Warehouse, Gochros sought employment with AlarMax by calling Roger Graf, president of AlarMax. (ECF No. 40-2 ¶¶ 3-6.) Gochros had been working at Alarm Warehouse for approximately five years, during which he was the sole employee at that company's Milford branch. (ECF No. 45-3 at 10.) Gochros received a $75,000 annual salary while at Alarm Warehouse; he did not recall the commission percentage he received, but recalled that his total take-home pay exceeded $110,000 annually for two of the last three years he worked there. (ECF No. 45-3 at 11-12.)

Gochros and Graf had as many as five phone calls before Gochros accepted employment with AlarMax. (ECF No. 45-3 at 20; *see also* ECF No. 45-4 at 7 (Graf's testimony that they had "a series of short interchanges over a period of a week or so.").) Gochros testified that during those calls, he and Graf discussed his "numbers in Connecticut," including that "the business averaged . . . [a]nywhere from 100,000 [dollars] to 140,000 [dollars] a month." (ECF No. 45-3 at 21.) Gochros testified that they also discussed his compensation at the time and "what [he would] need to make." (ECF No. 45-3 at 22.)

Graf also testified that the two discussed Gochros's compensation before he sent Gochros an offer of employment, though he remembered the conversations differently. (ECF No. 45-4 at 17.) Graf did not recall learning what Gochros's compensation had been at Alarm Warehouse before Gochros accepted employment, but recalled that they discussed "the details of what [Graf]

proposed to him as memorialized in [the offer letter]." (*Id*. at 18.) Graf did not recall discussing the sales Gochros had generated while at Alarm Warehouse, as Graf "generally [does not] let people tell [him] anything about their current employers." (*Id*. at 10.) Graf testified, however, that he may have learned information about Alarm Warehouse's performance in Connecticut between Gochros's first call to Graf and his acceptance of employment. (*Id*. at 12.)

### B. Gochros's Employment Agreement with AlarMax

Within a month of Gochros's first call to Graf, AlarMax offered Gochros at-will employment as the branch manager of its new branch in Milford, Connecticut. (ECF No. 40-2 ¶ 6.) The terms of Gochros's employment were set forth in a May 19, 2010 letter ("the Letter") written and signed by Graf. (*Id*. ¶¶ 6, 8; ECF No. 45-4 at 18.)[1]

The first two paragraphs of the Letter stated:

> This letter is to confirm our earlier conversation where I offered you the position of Branch Manager for the new distribution center of AlarMax Distributors, Inc. to be opened in Connecticut. You will be paid a bi-weekly salary and monthly commission totaling sixteen percent (16%) of the gross profit from your branch.
>
> During your ramp-up period, you will be paid a bi-weekly salary of $3,000.00 and a commission equal to two percent (2%) of the gross profit on your sales. Gross profit equals sales, less cost of goods, less freight and will be adjusted for any amounts that become non-collectable.

(ECF No. 40-6 at 2.) The Letter did not define the "ramp-up period." (ECF No. 40-2 ¶ 21.)

Gochros began working for AlarMax shortly thereafter. (*Id*. ¶ 7.)

### C. Gochros's and Graf's Interpretations of the Letter

---

[1] Graf testified that he handles all hiring decisions at AlarMax. (ECF No. 45-4 at 4.) Graf testified that he thinks he has used the compensation formulas referred to in the Letter with other incoming branch managers, though he has no "standard" compensation package, as "[e]verything is unique to the individual." (ECF No. 45-4 at 24.) Graf further testified that "[s]ome of the language" in the Letter "is the same" as language used in other offer letters, though the letters he uses for hiring are not identical. (ECF No. 45-4 at 21.)

3

After Gochros received the Letter, Gochros and Graf had another phone conversation, in which Gochros asked, in substance, what a "ramp-up" period was, and when he would be considered "ramped-up," or, "[i]n short form, when the 2 percent [would] become 16 percent." (ECF No. 45-3 at 29; *see also* ECF No. 45-4 at 25.) Gochros testified that Graf answered, "when your office is fully staffed and operational," but Graf denies this. (ECF No. 45-3 at 29; ECF No. 45-4 at 60-61.) Gochros and Graf did not discuss what "fully staffed" or "operational" meant. (ECF No. 40-4 at 34; ECF No. 45-4 at 59.)

Graf testified that his understanding was that the ramp-up period would end when "on a monthly basis 16 percent of gross profits exceed[ed] the [bi]weekly salary, plus 2 percent of the gross profit." (ECF No. 40-7 at 5-6.) According to Graf, at that point, Gochros would be paid a biweekly salary and a commission, which together would amount to 16 percent of the branch's gross profits. (ECF No. 40-7 at 3 ("What I meant in the first paragraph is you would be paid 16 percent of the gross profit. I explained that rather than paid once a month [*sic*], every two weeks you would get a check for $3,000, and that and the commission together would total 16 percent of the gross profit."); *id*. at 21 ("The salary and commission would total 16 percent.").) Graf testified that both formulas—the one set forth in the first paragraph of the Letter and the one set forth in the second—would be calculated on a monthly basis, and that "whichever way [Gochros] would make more money is how he would be paid during that period." (ECF No. 40-7 at 8.) Graf testified that the compensation formula under the first paragraph did not include a figure for the biweekly salary because at that point Gochros would "work straight commission for 16 percent of the gross profit," but that AlarMax would pay out the commission every two weeks, with the "balance" paid

4

out at end of the month. (ECF No. 40-7 at 20.) Graf testified that he told Gochros his understanding of the compensation structure in a phone call after Gochros received the Letter.[2]

Graf testified that he did not have a particular reason for offering Gochros 16 percent of gross profits, and "didn't run any specific numbers" to get to that figure. (ECF No. 45-4 at 23.) Rather, he had a "ballpark opinion" about the store's prospects for sales and gross profits, and thought that the store could make "[s]omewhere in the area of three and a half million dollars in sales and seven hundred thousand dollars in gross profit." (ECF No. 45-4 at 28-29.) Graf recalled that, at the time, other AlarMax locations were reaching $3.5 million in sales. (ECF No. 45-4 at 30.) Graf and Gochros discussed "from the beginning" Gochros's "wish to add additional staff" and "grow the business with the assistance [of] other personnel." (ECF No. 45-4 at 35.)

### D. Gochros Asks For Increased Compensation

During the entirety of his employment with AlarMax, Gochros was paid $3,000 biweekly, in addition to a commission of 2 percent of the gross profit at the Milford office. (ECF No. 40-4 at 40; ECF No. 40-10.) AlarMax asserts that it paid Gochros under the compensation formula set out in the second paragraph of the Letter for the duration of his employment because branch sales never reached "the cross-over point" at which it would begin to pay Gochros under the formula set out in the first paragraph.

In May 2011, Gochros broke his leg and was unable to work at the distribution center, but continued to work from home. (ECF No. 45-3 at 38.) During that time, AlarMax hired a salesperson, Derek Buzbee, who staffed the distribution center and assisted Gochros. (ECF No.

---

[2] Graf testified as follows: "Q: So when he called you after he got this letter and he asked you what the ramp-up period meant, did you explain it to him? A: I said the ramp-up period isn't until you would make more money via the straight 16 percent formula. Q: More money than what? A: More money than $3,000 and 2 percent of the gross profit." (ECF No. 40-7 at 4.)

5

45-3 at 46-47.) Graf testified that Buzbee "did not have a [compensation] plan like" Gochros's. (ECF No. 45-4 at 39.) In September 2012, AlarMax hired Gochros's daughter Camila to work at the branch, at which point Gochros considered his branch "fully staffed," as Steve Heier, AlarMax's manager of operations (ECF No. 45-4 at 14), authorized the hire and told Gochros that no other hires could be made. (ECF No. 45-3 at 47, 58-59.) Graf did not issue a hire letter to Camila and did not know whether she had a commission plan in place. (ECF No. 45-4 at 41.)

On November 4, 2013, Gochros emailed Graf to ask that AlarMax adjust his commission, writing, in relevant part:

> When I was hired back in May of 2010, every effort was made on both our parts to make my compensation similar to what I was being paid at Alarm Warehouse. Salary and automotive expenses were pretty much dead on. The big difference, at the start, was commission payments. The percent I would be making on profit on gross sales at the start (2%) was to be adjusted (16%) once the branch 'ramp-up period' had passed.
> . . . .
> It seems to me, that based on the inability to hire another experienced person when the opportunities arose, that the branch as currently staffed, is ramped up, and actually has been for the entire fiscal year that was just completed. October will be, as several previous months have been, another 6 figure sales month. At Alarm Warehouse, that would have meant a take-home commission payment of more than $1500. Here, it is $400.
> . . . .
> It would help me and my family greatly if this branch was deemed to be past the 'ramp-up period' and my commission was adjusted accordingly."

(ECF No. 40-11 at 2.) Gochros did not receive a response to the email. (ECF No. 45-3 at 49.) On February 7, 2014, Gochros forwarded the November 4 email to Graf again, writing, "Are we ever going to discuss this Roger?" (ECF No. 45-7 at 2.) Gochros called AlarMax's corporate offices twice asking to speak with Graf, but received no response from Graf. (ECF No. 45-3 at 50.)

In late 2014, Gochros sent another letter to Graf. (ECF No. 45-3 at 52-53, 55; ECF No. 45-8.) The letter, which is undated and unsigned, stated in relevant part:

6

> Your original offer to me was that I would make what I made at Alarm Warehouse while in your employ. My life and expenses were based on what I made at Alarm Warehouse. In August of 2012, a decision was made to not replace a departing employee. I was informed by Steve at that time that I should hire 'hourly help' as that was where my office was to be. The branch was to be considered fully staffed. At that point, my commission should have been raised to the offered amount of 16% from the 2% I was being paid for the previous 3 years. That would have, after 3 years as an Alarmax employee, brought me to the same compensation that I had been making at Alarm Warehouse.

(ECF No. 45-8 at 2.) Gochros resigned from AlarMax in August 2015. (ECF No. 45-3 at 25.)

## II. Legal Standard

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014) (internal quotation marks and citations omitted). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.,* 654 F.3d 347, 358 (2d Cir. 2011). On summary judgment a court must "construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Phillip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013).

## III. Discussion

### A. Section 31-72

Conn. Gen. Stat. § 31-72 states, in relevant part:

> When any employer fails to pay an employee wages in accordance with the provisions of sections 31-71a to 31-71i . . . such employee . . . shall recover, in a civil action, (1) twice the full amount of such wages, with costs and such reasonable attorney's fees as may be allowed by the court, or (2) if the employer establishes that the employer had a good faith belief that the underpayment of wages was in compliance with law, the full amount of such wages or compensation, with costs

7

and such reasonable attorney's fees as may be allowed by the court. Any agreement between an employee and his or her employer for payment of wages other than as specified in said sections shall be no defense to such action.

The CMWA defines wages as "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis of calculation." Conn. Gen. Stat. § 31-71a. The CMWA prohibits employers from "withhold[ing] or divert[ing] any portion of an employee's wages" except where "required or empowered to do so by state or federal law," or where authorized by the employee. Conn. Gen. Stat. § 31-71e.

The Connecticut Supreme Court has held that Section 31-72 "merely provides a remedy for violations of an existing wage agreement, and confers no rights above and beyond the agreement." *Connecticut v. YP Advert. & Publ'g LLC*, No. 3:16-cv-1424 (MPS), 2017 WL 810279, at *7 (D. Conn. Mar. 1, 2017) (citing *Geysen v. Securitas Sec. Servs. USA, Inc.*, 322 Conn. 385, 393-94 (2016); *Mytych v. May Dept. Stores Co.*, 260 Conn. 152, 165, 162 (2002)). "In other words, the Connecticut wage statutes do not purport to define the wages due; they merely require that those wages agreed to will not be withheld for any reason." *Geysen*, 322 Conn. at 394 (internal quotation marks and alterations omitted). I must therefore look to the underlying agreement between the parties to determine whether AlarMax improperly withheld commissions under the CMWA. *See Mytych*, 260 Conn. at 165 (holding that the "commission agreement is controlling" in adjudicating a claim under Section 31-72).

### B. The Letter's Ambiguities

AlarMax argues that it paid Gochros all of the commissions he was due under the Letter, which AlarMax argues is unambiguous. The Connecticut Supreme Court has held that:

> [A] contract is unambiguous when its language is clear and conveys a definite and precise intent. The Court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity. Moreover, the mere fact that the parties advance different interpretations of the language in question does not necessitate a

8

conclusion that the language is ambiguous. In contrast, a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. Any ambiguity in a contract must emanate from the language used by the parties. The contract must be viewed in its entirety, with each provision read in light of the other provisions, and every provision must be given effect if possible to do so. If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous.

*Harbour Pointe, LLC v. Harbour Landing Condo. Ass'n, Inc.*, 300 Conn. 254, 260–61 (2011) (internal quotation marks and alterations omitted). "Whether contract language is plain or ambiguous is to be determined by a court as a matter of law . . . ." *Grasson v. Bd. of Educ. of Town of Orange*, 24 F. Supp. 3d 136, 144-45 (D. Conn. 2014) (internal citations omitted). "To the extent the moving party's case hinges on ambiguous contract language, summary judgment may be granted only if the ambiguities may be resolved through extrinsic evidence that is itself capable of only one interpretation, or where there is no extrinsic evidence that would support a resolution of these ambiguities in favor of the nonmoving party's case." *Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008).[3]

---

[3] Defendant raises the question of whether Connecticut or Pennsylvania law governs the Court's analysis of the contract, as Defendant's principal place of business is in Pennsylvania. "A federal court sitting in diversity must apply the choice of law rules of the state in which it sits." *Brown v. Strum*, 350 F. Supp. 2d 346, 348 (D. Conn. 2004) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Therefore, Connecticut's choice of law rules apply. "The threshold choice of law question in Connecticut, as it is elsewhere, is whether there is an outcome determinative conflict between the applicable laws of the states with a potential interest in the case. If not, there is no need to perform a choice of law analysis, and the law common to jurisdictions should be applied." *Lumbermens Mut. Cas. Co. v. Dillon Co., Inc.*, 9 Fed. Appx. 81, 83 (2d Cir. 2001) (citations omitted). Pennsylvania applies the same rules of contract interpretation as those discussed above. *See, e.g.*, *Kripp v. Kripp*, 578 Pa. 82, 90-91 (2004) ("When the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself . . . . A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense . . . . While unambiguous contracts are interpreted by the court as a matter of law, ambiguous writings are interpreted by the finder of fact.") (internal citations omitted). Thus, there is no outcome determinative conflict between the applicable laws in this case and the Court need not engage in a choice of law analysis.

Thus, the Court must look to the language of the contract itself to determine whether an ambiguity exists; Gochros's and Graf's testimony regarding each's respective interpretations of the terms of the written agreement are not relevant to determining whether the agreement is ambiguous. *See Datto Inc. v. Braband*, 856 F. Supp. 2d 354, 365 (D. Conn. 2012) (limiting analysis to the language of an employment agreement to determine whether the agreement is ambiguous).

The relevant language of the Letter states:

> This letter is to confirm our earlier conversation where I offered you the position of Branch Manager for the new distribution center of AlarMax Distributors, Inc. to be opened in Connecticut. You will be paid a bi-weekly salary and monthly commission totaling sixteen percent (16%) of the gross profit from your branch.
>
> During your ramp-up period, you will be paid a bi-weekly salary of $3,000.00 and a commission equal to two percent (2%) of the gross profit on your sales.[4] Gross profit equals sales, less cost of goods, less freight and will be adjusted for any amounts that become non-collectable.

(ECF No. 40-6 at 2.) AlarMax argues that the first paragraph unambiguously states that after the ramp-up period ended, Gochros's compensation, i.e., the sum of a biweekly salary and monthly commission, would be 16 percent of the Milford branch's gross profits. AlarMax further argues that Gochros would be paid under the second paragraph's compensation structure until 16 percent of the branch's gross profits exceeded the sum of a $3,000 biweekly salary plus a commission of 2 percent of gross profits. (ECF No. 40-1 at 13-15.)

Gochros counters that, at a minimum, both the meaning of the "ramp-up period" and the formula for his compensation under the first paragraph (i.e., once he was considered "ramped up"), are ambiguous. Gochros further argues that his interpretation of these ambiguities—that his branch would be considered "ramped up" when it was "fully staffed" and that, under the first paragraph, his commission would increase from 2 percent to 16 percent of gross profits, and that his biweekly

---

[4] Graf testified that he understood that "your sales" meant total branch sales. (ECF No. 40-7 at 7.)

salary would remain the same—is reasonable. (ECF No. 45 at 12-13.) I agree with Gochros. Specifically, I find that the Letter is ambiguous, and that the extrinsic evidence submitted by the parties conflicts, in two key respects: the compensation Gochros was owed under the first paragraph and the meaning of the "ramp-up period." I discuss each of these ambiguities below.

    1.    <u>Compensation Under the First Paragraph</u>

First, the Letter is ambiguous as to whether Gochros was entitled to a biweekly salary in addition to a commission of 16 percent of gross profit under the first paragraph, or whether his total compensation under that paragraph was to be capped at 16 percent of gross profit. The first paragraph of the Letter reads, in relevant part: "You will be paid a bi-weekly salary and monthly commission totaling sixteen percent (16%) of the gross profit from your branch." (ECF No. 40-6.) It is not clear whether the word "totaling" in this sentence modifies only the word "commission," as Gochros argues, or whether it modifies the phrase "a bi-weekly salary and monthly commission," as AlarMax argues.

AlarMax submits that "a bi-weekly salary and monthly commission totaling sixteen percent . . . of the gross profit" means that Gochros's compensation under the first paragraph would, including both salary and commission, amount to 16 percent of that month's gross profit, but that the payment would be divided into a biweekly salary of an unspecified amount, plus, apparently, a "true-up" payment at the end of the month. (ECF No. 46 at 4.) One textual argument in AlarMax's favor is that the Letter does not use the word "totaling" after the word "commission" in the second paragraph. Rather, the second paragraph states: "During your ramp-up period, you will be paid a bi-weekly salary of $3,000.00 and a commission equal to two percent (2%) of the gross profit on your sales." (ECF No. 40-6.) AlarMax argues that the second paragraph's reference to "a bi-weekly salary of $3,000.00 and a commission *equal to* two percent . . . of the gross profit"

11

(emphasis added) means that under the second paragraph, Gochros would receive a biweekly salary of $3,000 and a *separate* commission of 2 percent of gross profits—which he did in fact receive. Thus, AlarMax claims that, unlike the word "totaling" in the first paragraph, which AlarMax argues modifies "a bi-weekly salary and monthly commission," the phrase "equal to" modifies only "a commission."

AlarMax's interpretation assigns different meanings to "totaling" and "equal to." Words in contracts take on their ordinary meanings, however, unless the context shows that a special meaning was intended, *Cohen v. City of Hartford*, 244 Conn. 206, 215 (1998), and dictionary definitions of "totaling" and "equal to" reflect the common understanding that they are synonyms.[5] Thus, the use of the terms "totaling" and "equal to" in the first and second paragraphs, respectively, does not clarify whether Gochros was to be paid a salary in addition to a commission of 16 percent of gross profits under the first paragraph, or whether his compensation was to be capped at 16 percent of gross profits. In short, given the synonymous meanings of "totaling" and "equal to", AlarMax has not established that its interpretation that the two words have different meanings is the only reasonable one.

AlarMax also suggests that the biweekly salary set forth in the first paragraph was left without a dollar amount because it was expected to change to reflect the gross profit in a given month. (ECF No. 46 at 4 n.2.) This implies that the "biweekly salary" was simply a means of paying out the 16 percent commission in biweekly installments. AlarMax's interpretation does not resolve the ambiguities in the Letter for three reasons. First, AlarMax's interpretation conflicts

---

[5] *See* "Total [*verb*]: to amount to," Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/totaling (last visited January 23, 2018); "Equal [*adjective*]: of the same . . . amount . . . as another," Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/equal (last visited January 23, 2018).

with the common understanding of the term "salary," which implies a fixed level of compensation.[6] If the dollar amount of the biweekly payment was to be left variable, as AlarMax claims, why it was called a "salary" is not clear. Second, AlarMax's interpretation arguably renders the term "biweekly salary" superfluous, an interpretation courts are cautioned to avoid. *See Ramirez*, 285 Conn. at 14 ("[T]he law of contract interpretation militates against interpreting a contract in a way that renders a provision superfluous.") (internal quotation marks and alterations omitted). It is not clear why AlarMax included a provision for a "biweekly salary" in the first paragraph if Gochros's compensation under that paragraph was intended to be a commission of 16 percent of gross profits only, as AlarMax claims; while it is possible that it remained necessary to include some indication of the frequency of payment, it is still not clear why the word "salary" was used if, as AlarMax suggests, the amount was intended to be variable. (ECF No. 46 at 4 n.2.)[7] Third, AlarMax's interpretation assigns two different meanings to the term "salary": AlarMax suggests that in the second paragraph the "salary" is a fixed default payment that Gochros would receive regardless of any commission earned, but in the first paragraph, it is a means of paying out a monthly commission in variable installments.[8] Apart from pointing out that "salary" is given a numerical value in one paragraph but not in another, AlarMax fails to explain why the Court should assign two different meanings to the same word. *See Two Farms Inc. v. Greenwich Ins. Co.*, 628 Fed. Appx. 802, 805 (2d Cir. 2015) ("Generally, 'a word used by the parties in one sense will be

---

[6] *See* Webster's Third New International Dictionary, "Salary: fixed compensation paid regularly . . . ."; Black's Law Dictionary (10th ed. 2014), "Salary: An agreed compensation for services . . . usu[ally] paid at regular intervals on a yearly basis, as distinguished from an hourly basis."
[7] As discussed below, an examination of Graf's testimony on this issue only sows further confusion.
[8] AlarMax does not explain how a commission that is measured monthly would be divided into biweekly payments.

13

given the same meaning throughout the contract in the absence of countervailing reasons.'") (quoting 11 Williston on Contracts § 32:6 (4th ed.)) (internal citations omitted).

At a minimum, Gochros's interpretation—that he would be paid a biweekly salary of $3,000 plus a 16 percent commission once he transitioned to the structure under the first paragraph—is at least as reasonable as AlarMax's, which makes the letter ambiguous. As discussed, the verbiage used in the Letter is open to the reasonable interpretation that "totaling" and "equal to" were intended as synonyms, and that "salary" has the same meaning in the first and second paragraphs. (ECF No. 45-3 at 11-12, 21-22.) Thus, AlarMax has not met its burden of demonstrating that the first paragraph of the Letter sets out an unambiguous compensation structure.

2. "Ramp-Up Period"

The Letter is also ambiguous as to the meaning of the "ramp-up period." The second paragraph of the Letter states in relevant part, "[d]uring your ramp-up period, you will be paid a bi-weekly salary of $3,000.00 and a commission equal to two percent (2%) of the gross profit on your sales." (ECF No. 40-6 at 2.) The Letter does not define the term "ramp-up period" and, in particular, does not indicate when it would end.

The term "ramp-up period" is susceptible to varying definitions. *See Datto Inc.*, 856 F. Supp. 2d at 365 ("whether such term is ambiguous turns on whether it has varying definitions in common parlance") (quoting *Remillard v. Remillard*, 297 Conn. 345, 355 (2010)). Dictionaries define "ramp-up" as "buildup, increase," and provide as a financial definition, "an increase in the amount of products or services a company sells, usually by expansion into new markets or

geographic regions."[9] Moreover, the word "period" suggests a length of time.[10] Because the Letter does not provide a metric for measuring the length of the "ramp-up period," whether the end of the "ramp-up period" would be marked by a set date or a milestone in the branch's activities, such as a certain level of staffing, profits, or another metric, is unclear.

Gochros's interpretation that the length of the ramp-up period would be measured by the level of staffing at the Milford branch is reasonable, because it suggests a length of time fixed by an (arguably) objective metric. It is at least as reasonable as AlarMax's interpretation, under which the "ramp-up period" is not a time period at all, but a compensation floor that Gochros could default to at any time if profits decreased enough. AlarMax asserts that Gochros would be paid under the second paragraph unless branch sales reached a level where 16 percent of gross profits "exceeded" the sum of Gochros's biweekly salary of $3,000 plus his 2 percent commission. (ECF No. 40-1 at 6, 15; ECF No. 40-2 ¶ 22.) AlarMax repeatedly characterizes the Letter as providing for a comparison between Gochros's compensation under each of the two paragraphs to determine which paragraph governed by providing a greater yield, but the word "exceeds"—or any other word implying a comparison—does not appear in the Letter. AlarMax points to no textual evidence to support its assertion that the first paragraph's structure would be triggered only when it would yield greater compensation than what Gochros received under the second paragraph. Given the commonly understood meanings of the terms "ramp-up" and "period," AlarMax's interpretation is plainly not the only reasonable interpretation of the Letter.

---

[9] *See* "Ramp-up," Merriam-Webster.com, https://www.merriam-webster.com/dictionary/ramp-up?utm_campaign sd&utm_medium=serp&utm_source=jsonld (last visited January 22, 2018). The Tenth Edition of Black's Law Dictionary does not define "ramp-up period" or "ramp-up."
[10] *See* "Period: the completion of a cycle, a series of events, or a single action" Merriam-Webster.com, https://www.merriam-webster.com/dictionary/period?utm_campaign=sd&utm_medium=serp&utm_source=jsonld (last visited February 5, 2018).

## C. Extrinsic Evidence

The parties have submitted conflicting extrinsic evidence regarding the intent of their agreement, making summary judgment unwarranted.

As to Gochros's compensation under the first paragraph, Graf testified that he intended for Gochros to receive only a commission of 16 percent of the branch's gross profits. (*See* ECF No. 40-7 at 20 ("What you call the letter formula . . . I take as you work straight commission for 16 percent of the gross profit").) Graf himself provided contradictory testimony, however, as to how compensation under the first paragraph would work: Graf at one point testified that "every two weeks [Gochros] would get a check for $3,000, and that and the commission together would total 16 percent of the gross profit" (ECF No. 40-7 at 3). At another, he testified that the biweekly payment could be higher than $3,000, depending on the profits that month. (*See id.* at 20 ("You are going to have something come every two weeks, plus the balance . . . . So down the road if you were doing a fabulous sales number and you were making a huge total with the 16 percent of your sales, rather than have you get a smaller number every two weeks and a larger commission, we may split it up and say let's spread it out throughout the month . . . . That 16 percent could have been paid out as 5,000 biweekly or what have you.").)

With regard to when Gochros would transition from compensation under the second paragraph to compensation under the first paragraph, Graf testified that he envisioned a "crossing point" at which Gochros's compensation structure would shift:

> What I intended is to let him make as much money as he possibly could. The term in my head, but I do not recall using this term with him, but the term in my head is until you cross the crossing point. You could boil this down to an arithmetic equation . . . . The 16 percent is going to be what 16 is. Three thousand plus two is going to be some number, and there would be an intersecting point where they

would be identical, and then there would be the point where the 16 percent would exceed the three thousand plus two.

(ECF No. 40-7 at 9.) Graf also testified that under his interpretation, Gochros could be paid under the second paragraph's formula one month, then be paid under the first paragraph the next month if doing so would result in higher compensation due to a substantial increase in gross profits, and then once again be paid under the second paragraph in the third month, in the event gross profits substantially decreased once again.[11] AlarMax also submitted documents showing calculations of branch sales, gross profit, and Gochros's compared earnings under each formula, performed by AlarMax's office manager during each month of Gochros's employment. (ECF No. 40-8; ECF No. 46-1.) These documents suggest that AlarMax in fact intended to pay Gochros under the first paragraph only when that compensation exceeded his compensation under the second paragraph.

But Gochros offered conflicting extrinsic evidence on these issues. He testified that he discussed with Graf that the ramp-up period would end when his branch was "fully staffed" and "operational," and that he understood the Letter to state that he would receive both a salary and a 16 percent commission under the first paragraph after his branch was considered "ramped up." (ECF No. 45-3 at 29.) Gochros explained that this interpretation was in line with his past compensation in a similar role at Alarm Warehouse, and that he and Graf discussed his past compensation when they discussed the terms of the Letter. (ECF No. 45-3 at 11-12, 21-22.) In the November 4, 2013 email and late-2014 letter Gochros sent to Graf, Gochros reiterated that he believed he was "ramped up" because he was "fully staffed," and that he understood that his compensation structure was to be governed by the first paragraph of the Letter at that point. (ECF

---

[11] *See* ECF No. 40-7 at 9 ("Q: Would it be possible for him to be paid according to the ramp-up formula in, let's say, March, the post-ramp-up formula in April and then in May the ramp-up formula again? Could it go back and forth like that? A: I would think that's possible for a period of time. That did not occur here.").

No. 40-11 at 2; ECF No. 45-8 at 2.) These documents and Gochros's testimony about the parties' intent in entering into the agreement plainly conflict with Graf's version of events.

Because the Letter is ambiguous and because the parties have submitted conflicting extrinsic evidence about their intent, genuine issues of material fact exist as to whether AlarMax improperly withheld commissions owed to Gochros in violation of the CMWA.

## IV.  Conclusion

For the reasons stated above, Defendant's Motion for Summary Judgment is DENIED.


IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J.

Dated:     Hartford, Connecticut
           February 8, 2018